UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WINNETHA BENN-BURTON, CASE NO. 10-10736

Plaintiff,

v. HON. AVERN COHN

ERIK K. SHINSEKI, Secretary
Department of Veterans Affairs,

Defendant.
_______________________________________/

**MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 28)**

## I. Introduction

This is an employment discrimination case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. (Title VII), and the Equal Pay Act 29 U.S.C. §206(d)(1). Plaintiff Dr. Winnetha Benn-Burton (Benn-Burton), an employee of Veterans Affairs, is suing Erik K. Shinseki, in his capacity as the Secretary for Veterans Affairs (VA). The complaint is in four counts: (I) gender discrimination; (II) hostile work environment; (III) retaliation; and (IV) violation of the Equal Pay Act. Benn-Burton says she was not promoted based on gender discrimination, paid less than male peers, subjected to a hostile work environment, and retaliated against for filing Equal Employment Opportunity (EEO) complaints all while an employee at Veterans Affairs Ann Arbor Healthcare System (Hospital).

Before the Court is VA's motion for summary judgment. For the reasons that follow, the motion is **GRANTED.**

## II. Background

Benn-Burton began working for VA in 1990 as a staff psychologist at the Hospital. Her pay grade at the time of her hire was GS-12. Benn-Burton was promoted in 1999 to the position of Clinical Psychologist (with a grade of GS-13). Dr. Ken Adams (Adams) supervised Benn-Burton from the time of her hire in 1990 to 2007. Also in 1999, Benn-Burton assumed the position of coordinator of the Work Therapy Program (WTP). The WTP program assists unemployed veterans reentering the workforce. In this position, Benn-Burton supervised six WTP staff members.

In July 2007, Benn-Burton assumed the position of Local Recovery Coordinator (LRC) and section chief of the Recovery and Community Reintegration Section (RCR). These positions required operation of the Homeless Program, Compensated Work Therapy Program, and the inpatient social work discharge planning. She also served as acting director of the WTP from March 2008 to August 2008.

In 2007, the Hospital undertook an internal reorganization that combined the Psychology and Psychiatry services into one department titled Mental Health. As a result of this change, Brian Martis became Benn-Burton's immediate supervisor. Her second level supervisor was Israel Liberzon, Chief of Mental Health Services.

In 2003, Congress mandated a change in compensation scales for certain professionals, moving from a system called Title V to a new system called Hybrid Title 38. 38 U.S.C. §7401. The general goal of the switch was to make compensation for professional positions more competitive with the private sector. To make the switch between systems the Hospital employed a one-time special boarding process, staffed by Hospital personnel, designed to assign grades from the new system to current

employees. The Hospital says the boarding process was ministerial and not a vehicle for promotion.[1]

In 2008, as part of the boarding process, the Professional Standards Board[2] asked Benn-Burton to submit a functional statement based on her job duties. Henry Buchtel advised Benn-Burton and her colleague Stephen Chermack to submit statements based on a GS-14 grade. Buchtel was a member of the Professional Standards Board, but not on the three-member boarding panel who evaluated Benn-Burton. Adams also informed Benn-Burton that a GS-14 statement was appropriate based on her duties. Benn-Burton, who was a GS-13 at the time, prepared such a statement. The statement was not passed along to the board; instead, Adams submitted a generic GS-13 statement on her behalf, based only on her role as coordinator for the WTP. The board determined her grade to be a GS-13. Chermack was a GS-14 before the boarding process. As such, a panel in Washington, D.C. completed his boarding process. The board graded Chermack as a GS-14.

Around this time, Benn-Burton had several conflicts with other Hospital personnel; specifically, conflict over the management of patient logs with Lawrence Pearlman. Pearlman was another Clinical Psychologist in the Mental Health Department. Benn-Burton asserts that Pearlman continually badgered her about the patient logs despite her requests for him to stop.

Benn-Burton reports several conflicts with Martis, her direct supervisor. Martis reprimanded her for an absence at a leadership meeting in a hostile and unprofessional tone. He also publically criticized her for speaking up in a meeting. In addition, Benn-

---

[1] It is not clear if other VA facilities used the "one time boarding process" to promote.
[2] The three individuals who completed Benn-Burton's boarding process.

Burton says she was asked by her supervisors to discipline Joyce Fraker over conflicts with another employee. She was also asked to counsel Cheryl Garnett about retirement after allegations of professional misconduct. Benn-Burton asserts the requests were inappropriate.

In 2008, Benn-Burton filed two EEO complaints against the Hospital. The first complaint says she did not receive a timely employee evaluation between 2007 and 2008;[3] when she did get an evaluation it was lower than normal. In 2009, Mental Health undertook further reorganization; Benn-Burton's duties as the RCR section chief were eliminated. Benn-Burton's second complaint says removal of her duties was in retaliation for filing the previous EEO complaint. Benn-Burton says that these factors combined to create a hostile work environment. As a result, in September 2009 Benn-Burton transferred to a VA facility in Phoenix, AZ. She returned to Michigan in 2011 to work at the Battle Creek VA facility.

As relief Benn-Burton seeks money damages for emotional distress, back pay, attorney's fees, costs, and interest. She also seeks a declaration that she suffered discrimination, establishment of a reporting and monitoring system to prevent future discrimination, and an injunction and order for a promotion to GS-14.[4]

## III. Veterans Affairs' Motion for Summary Judgment

VA now moves for summary judgment on the basis that there are no material facts in dispute and VA is entitled to judgment as a matter of law because Benn-Burton

[3] VA says no one in the Hospital received a mid-year evaluation for this period.

[4] Should Benn-Burton be successful, this is not a form of relief the Court can grant in this case.

has failed to advance sufficient evidence on any of her claims to make out a genuine issue of fact that requires a trial.

## IV. Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); *see* Anderson, 477 U.S. at 249–50.

## V. Discussion

### A. Administrative Bar to Count (I) Gender Discrimination

The first issue is whether Benn-Burton's claim of gender discrimination for failure to promote is administratively time barred. As a prerequisite to filing suit under Title VII

a federal employee must exhaust the administrative remedies outlined in the Equal Employment Opportunity Commission (EEOC) regulations. Hunter v. Sec. of U.S. Army, 565 F.3d 986, 993 (6th Cir. 2009). An aggrieved employee is required to seek EEO counseling within 45 days of the discriminatory action or its effective date. 29 C.F.R. §1614.105(a)(1); Benford v. Frank, 943 F.2d 609, 612 (6th Cir. 1991). Failure to seek such counseling in a timely manner will result in the dismissal of a claim. Hunter, 565 F.3d at 993.

A district court may dismiss a Title VII case where a plaintiff has failed to seek EEO counseling within 45 days of the discriminatory act. Dixon v. Gonzales, 481 F.3d 324 (6th Cir. 2007). Benn-Burton was boarded at GS-13 on May 13, 2008. She found out about the board's decision on May 22, 2008. The parties agree that she did not seek EEO counseling until August 4, 2008, beyond the required 45 days. Therefore, this claim is administratively barred unless the deadline was equitably tolled

The parties disagree as to whether Benn-Burton qualifies for equitable tolling. Five factors determine whether tolling the reporting period is appropriate: (1) lack of notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement. Seay v. Tennessee Valley Auth., 339 F.3d 454, 469 (6th Cir. 2003). The Supreme Court cautions that the principle should be used sparingly. Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990).

These factors, save number five, are not in dispute. Benn-Burton says the reporting period should be tolled because she did not know the boarding process was

discriminatory until after the reporting period expired. If the boarding process was discriminatory, and Benn-Burton had no reason to know she was the victim of discrimination, equitable tolling may apply. Tolling will apply if the Hospital denied or obstructed her access to information related to the discrimination. Dixon, 481 F.3d at 332.

In Dixon, the plaintiff was an ex-FBI agent who reapplied to the Bureau. His application was denied based on unfavorable reviews from former colleagues and supervisors. Id. at 328-30. The Bureau would only tell him his application was denied, nothing further. Several years later, Dixon filed a Freedom of Information Act (FOIA) request to obtain his personnel file. Id. at 329. Upon seeing a negative review from a former supervisor he previously accused of racism, he contacted an EEO counselor. Id. The Sixth Circuit held tolling the reporting period was appropriate because Dixon had no reason at the time of the denial to believe his rejection was tainted by racism or retaliation.

Similarly, according to Benn-Burton, she had no reason to know keeping her at a grade of GS-13 was discriminatory until she learned that Chermack was a GS-14. However, her situation departs from Dixon's in several meaningful ways. First, the general service grade system was not a secret. Benn-Burton goes into detail about why her job responsibilities qualified her for a GS-14 grade. Learning of Chermack's grade did not suddenly alert her to the inadequacy of her status.

Further, and important to the reasoning of Dixon, Benn-Burton has not shown that the Hospital withheld, concealed, or obstructed information. In contrast to Benn-Burton's situation, the FBI denied Dixon's efforts to uncover basic facts about the

rejection of his application; he eventually had to file a FOIA request. Id. Dixon had no opportunity to discover the cause of the adverse decision until then. Here, Benn-Burton had many opportunities to determine the cause and circumstances of her continuing as a GS-13.

Benn-Burton does not state a sufficient case for tolling of the reporting period. She was fully informed of the legal and administrative procedures at her disposal. Finally, she was apprised of the unfavorable event but did not pursue her administrative remedies in a timely fashion. Benn-Burton's Title VII employment discrimination claim is administratively barred.

B. Count (I): Gender Discrimination

1. The Boarding Process

If Benn-Burton did qualify for equitable tolling, she would first have to make a prima facie case of gender discrimination to survive summary judgment. "In order to establish a prima facie case of discrimination based upon a failure to promote, the plaintiff must demonstrate that: (1) [she] is a member of a protected class; (2) [she] applied for and was qualified for a promotion; (3) [she] was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received the promotion." White v. Columbus Metropolitan Housing Authority, 429 F.3d 232, 241-244 (6th Cir. 2005), quoting Nguyen v. City of Cleveland, 229 F.3d 559, 562-63 (6th Cir. 2000). Both parties agree that Benn-Burton is a member of a protected class. The other three factors are in dispute.

2. Adverse Employment Decision

Failure to promote qualifies as an adverse employment decision under the scope and protection of Title VII. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998). The local Professional Standards Board graded Benn-Burton as a GS-13. She says she should have been promoted to a GS-14 by the board. Benn-Burton points to the language of the Hospital's materials on Title 38 Hybrid Implementation, which she says allows the possibility of an increase in grade. The same materials she cites also say: "this is not a promotion board." Nevertheless, Benn-Burton says that her job description required the board to grade her as a GS-14. This claim, however, is undermined by the fact that no one from the Hospital was promoted through the boarding process.

3. Similarly Situated Males

Benn-Burton must next show that she was treated differently in the boarding process than similarly situated males. Chermack, she says, was boarded as a GS-14. Chermack, however, was a GS-14 since 2004 and his boarding process went through Washington, D.C. Not only was Benn-Burton not treated differently she was not treated by the same people. VA points out that Giardino, another male psychologist and section chief of the PTSD division, had similar qualifications to Benn-Burton but was also boarded as a GS-13. VA says he, rather than Chermack, is the appropriate comparison.

4. Pretext

If Benn-Burton had established a prima facie case of discrimination, the burden then shifted to VA to articulate a legitimate non-discriminatory reason for the adverse employment action. The employer only has to produce admissible evidence showing

"that the plaintiff was rejected, or someone else was preferred, for a legitimate nondiscriminatory reason." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142-143 (2000) (Defendant's "burden is one of production only, not of persuasion.").

In response, VA says the Hospital's boarding process simply was not an avenue for promotion. To rebut the non-discriminatory explanation offered by VA, Benn-Burton must show that the reason offered by defendant has no basis in fact, did not actually motive its conduct, or was insufficient to warrant the challenged conduct. Clay v. UPS, 501 F.3d 695, 704 (6th Cir. 2007).

In support of an inference of pretext Benn-Burton points out that Adams replaced her GS-14 functional statement to the Professional Standards Board with a generic GS-13 statement. Further, pretext should be inferred, she says, because she was objectively qualified for the position and the Hospital has made inconsistent statements about the boarding process.

Benn-Burton has not rebutted VA's explanation. The evidence she cites does not go to the core of VA's explanation. The Hospital did not use the boarding process as a vehicle for promotion. The comparison Benn-Burton uses as evidence of discrimination, Chermack, is unconvincing. Chermack was promoted to a GS-14 grade four years previously. Finally, Benn-Burton has not demonstrated any evidence that if there was an adverse decision it was the result of intentional gender discrimination. She makes only conclusory allegations unsupported by any evidence.

C. Count (II): Hostile Work Environment: Sexual Harassment

Benn-Burton claims that the male leadership at the Hospital engaged in sexual harassment by creating a hostile work environment. A hostile work environment exists where the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys. Inc., 510 U.S. 17, 21 (1993). A hostile work environment violates Title VII. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986). To establish a claim for hostile work environment Benn-Burton must show she is the member of a protected class (this is undisputed), she was subjected to unwelcome harassment, the harassment was based on her gender, the harassment affected a term, condition, or privilege of employment. Finally, that the Hospital knew or should have known of the conduct and failed to take preventative or corrective actions. Michael v. Caterpillar Fin. Services Corp., 496 F.3d 584, 600 (6th Cir. 2007).

1. Unwelcome Harassment

To succeed on her claim Benn-Burton must demonstrate she felt sexually harassed and that a reasonable person in her position would have felt sexually harassed. Black v. Zaring Homes, Inc., 104 F.3d 822 (6th Cir. 1997). Benn-Burton points out that sexual harassment need not be sexually explicit in nature. Targeting women with abusive conduct based on gender can constitute a hostile work environment claim. *See* Williams v. GMC, 187 F.3d 553, 565 (6th Cir. 1999).

a. Incidents of Harassment

Benn-Burton points to several incidents to support her claim of sexual harassment.

- Pearlman, a fellow Clinical Psychologist, harassed Benn-Burton in communication related to patient logs. (December 2005).
- Supervisors inappropriately asked Benn-Burton to counsel and discipline other employees. (March-April 2008, Joyce Amaya) (February 2008 Garnett)
- Adams, Benn-Burton's former supervisor, took credit for her work from 1990 to 2007.
- Martis, Benn-Burton's supervisor, yelled at her over the telephone after an absence from a leadership meeting. (December 17, 2007) He also publicly rebuked Benn-Burton after she voiced her opinion in a staff meeting. (February 11, 2008).
- Benn-Burton did not receive a mid-term performance evaluation between 2007 and 2008.
- Benn-Burton's 2007-2008 performance evaluation was lower than normal. (November 26, 2008). She was evaluated as "fully successful."
- Benn-Burton's duties as section chief of RCR were eliminated. (May 14, 2009).

The record offers further explanation of these events. With regard to Pearlman, Benn-Burton includes in her exhibits an email related to the case log conflict. In this email she outlines her frustration with the way she has been treated by Pearlman over the logs. Nothing, however, in her description of the event raises an inference of gender based harassment. Just the opposite, her email is followed by a reply from

Pearlman; rather than harassing, intimidating or aggressive, the tone and substance of the reply is contrite and conciliatory.

Next, Benn-Burton says she was asked to discipline other employees. One of the employees was Joyce Fraker, an employee on Benn-Burton's staff. Part of the duties of a supervisor is to manage staff. Management of staff includes providing counseling and discipline.

Next, Benn-Burton says her supervisors asked her to counsel Garnett to retire. Benn-Burton was a friend of Garnett. Garnett was accused of serious professional misconduct; allowing or encouraging her to retire was a generosity. It is unclear what Benn-Burton finds objectionable about these events. These events appear to be nothing outside of the ordinary tribulations of working life and nothing that raises an inference of sexual harassment.

Next, Benn-Burton says Martis spoke to her in an aggressive and hostile tone on several occasions. Even if this language was abusive the Supreme Court has cautioned against finding harassment in isolated incidents of abusive language. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). The two incidents with Martis are both unpleasant but not extreme.

Finally, the Hospital says that no one received a mid-term performance evaluation for the 2007-2008 period and her performance review and elimination of her RCR section chief duties was justified based on poor work product. Moreover, her evaluation was not unfavorable as she was marked as "fully successful" in her role as LRC.

b. Unpleasant v. Hostile

The incidents that Benn-Burton cites do not support an objective finding of sexual harassment. The Sixth Circuit has considered the line between an unpleasant work environment and a hostile work environment many times. For example, in Black, *supra*, the Sixth Circuit refused to find an objectively hostile work environment where male co-workers made repeated references to breasts, referred to women as "broads," the plaintiff was told by her boss that "she made great money for a woman," and the plaintiff was subjected to sexual innuendo. The Black Court explained that this conduct was merely offensive and did not rise to the level of severe or pervasive. Id. at 826.

The Sixth Circuit further explored the limits of a hostile work environment claim in Bowman v. Shawnee State Univ., 220 F.3d 456 (6th Cir. 2000). Bowman complained of being unjustly reprimanded by his boss, called at home, subjected to abusive language, sexual innuendo, touched on the buttocks, stripped of job duties, and a myriad of other petty slights. Id. at 458-60. The Sixth Circuit refused to find a hostile work environment. The panel explained there was a difference between harassment and discriminatory harassment. Id. at 464. Conceding that the plaintiff suffered intimidation, ridicule, and mistreatment, the panel explained that the conduct was not pervasive or severe enough to constitute a hostile work environment or sufficiently related to gender. Id.

Benn-Burton's claims are similar to the plaintiff in Bowman, *supra*. She identifies a litany of what she says are snubs, insults, and mistreatment, all relatively minor and none involving conduct that raises an inference of gender discrimination. Further, the treatment she endured was less severe and less overtly sexual than the conduct in Black and Bowman. Benn-Burton has not advanced sufficient evidence to support an

objective finding of sexual harassment. The incidents she cites do not rise above the level of ordinary workplace conflict.

2. Harassment Based on Gender

If the conduct above rose to the level of actionable discrimination, Benn-Burton still must show that it occurred because of her gender. This, however, she has not done. None of the incidents she complains of are sexually based or lewd; Benn-Burton was not subjected to unwelcome sexual advances, exposed to demeaning jokes, nor was she threatened or humiliated. Faragher v. City of Boca Raton, 534 U.S. 775 (1998). The only evidence Benn-Burton advances of gender based harassment is that she is a woman and she felt harassed. Benn-Burton has not put forward any evidence to show that the treatment she endured was because of her gender.

Benn-Burton does not proffer or advance evidence to raise an issue of fact for trial on her claim of a hostile work environment. She has not shown the behavior was severe or pervasive enough to rise to the level of harassment. She has not advanced any evidence that the conduct she faced was motivated by or related to her gender.

D. Count (III): Retaliation

1. Loss of RCR Duties

Benn-Burton says she was subjected to retaliation for filling EEO complaints against her supervisors. As a result of the retaliation, she was stripped of her duties as section chief of RCR. To succeed on a claim of retaliation, Benn-Burton must show: she engaged in a protected activity; the Hospital knew about it; the Hospital made an adverse employment action against her; and there was a causal connection between

the protected activity and the retaliation. Polk v. Yellow Frieght Sys.,Inc. 876 F.2d 527, 531 (6th Cir. 1999).

Filing an EEO complaint is a protected activity. 42 U.S.C. §2000e-3(a). Benn-Burton filed two EEO complaints against the Hospital. She filed the first complaint in May of 2008 after Martis warned another staff member not to associate with her. She filed the second in August of 2008 after she was not invited to a graduation party and her duties as RCR section chief were eliminated. The parties do not dispute that her supervisors knew about the EEO complaints. The parties disagree on whether the Hospital eliminated Benn-Burton's duties as section chief of RCR in retribution for her EEO complaints. The loss of job responsibilities can be grounds for a claim of retaliation. Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 66-67 (2006).

In response to Benn-Burton's claim, VA offers a non-discriminatory reason for its decision. VA explains that the creation of the RCR section chief position was temporary and that Benn-Burton was expected to develop a position description, strategic plan, and otherwise provide direction and leadership. VA said she did none of these things effectively. The hope of RCR as a program was to streamline and coordinate similar services. After a year, the Hospital determined that the reorganization did not add to efficiency or better service. The Hospital restored the original organizational structure.

2. Pretext

a. Temporal Proximity

VA offers a non-discriminatory reason for the employment decision. This shifted the burden to Benn-Burton to show that the reason was pre-textual. Benn-Burton must show that VA's explanation had no basis in the facts, did not actually motive its conduct,

or was insufficient to warrant the challenged conduct. Browning v. Dept. of the Army, 436 F.3d 692, 695 (6th Cir. 2006). Benn-Burton says the removal of her duties as RCR section chief occurred shortly after her EEO complaints. She says this temporal proximity raises an inference of retaliation.

Benn-Burton filed EEO complaints in May and August of 2008. Her duties as section chief were eliminated May 14, 2009. Benn-Burton cites Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008) to support her position that temporal proximity of an adverse decision and an EEO complaint is sufficient to raise an inference of retaliation. Mickey, however, was fired the same day his employer learned of his EEO complaint for age discrimination. Id. The Mickey Court explained that temporal proximity is usually not enough to establish a causal connection but the immediate proximity of Mikey's termination created an inference of retaliation. Id.

Temporal proximity is a relevant factor to a retaliation claim. There is no bright line rule. However, the Sixth Circuit has found a period of four months insufficient to make out a prima facie case of retaliation. Cooper v. City of North Olmsted, 795 F.2d 1265 (6th Cir. 1986). The Sixth Circuit has also found a period of three months sufficiently close in time to raise an inference of retaliation. Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 563 (6th Cir. 2004).

Benn-Burton did not lose her duties as section chief for more than nine months after her second EEO complaint and almost a year after her first complaint. The temporal proximity between Benn-Burton's complaint and the adverse decision is not sufficiently close to raise an inference of retaliation. The Hospital listed specific items it expected Benn-Burton to accomplish that she failed to perform or performed poorly.

Benn-Burton has not challenged this description of her work or shown any evidence that would create a question of material fact that would require a trial.

b. Performance Review

The only other bit of evidence Benn-Burton cites as retaliatory is that she was given a lower than normal performance review in the fall of 2008. "In order for a performance evaluation to be materially adverse, it must affect the employee's 'position, grade level, salary, or promotion opportunities.'" Taylor v. Solis, 571 F.3d 1313, 1321 (D.C. Cir 2009). First, Benn-Burton does not say that this evaluation was negative, only that it was lower than average. She received marks of "fully successful," the second highest score. Second, she does not say that this evaluation has impacted or will impact any tangible job or salary benefits. Just the opposite, Benn-Burton was already at step 10 of her pay grade, the highest level.

E. Count (IV): Equal Pay Act Violation

Benn-Burton says that the Hospital violated the Equal Pay Act by paying a male, Chermack, more for performing the same work. A successful Equal Pay Act Violation claim requires the plaintiff to demonstrate higher wages were paid to a male who performed equal work in equal working conditions. Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974).

Of the psychologists on staff, only Adams and Chermack earn more money than Benn-Burton. In fact, Benn-Burton earns more than several male psychologists on staff. As the basis of her Equal Pay Act claim, she contends that she and Chermack perform similar duties.

Chermack runs the Outpatient Psychiatry Program and the Substance Abuse Clinic at the Hospital. Chermack, a GS-14, describes his role as section chief as being responsible for the largest mental health program in the facility, overseeing a large patient population, and managing a large and diverse staff that included social workers, support staff, M.D.s, and psychologists. He was hired in 2003 to fill an administrative/ leadership position. The interview process was extensive and involved personnel from the Hospital and from the University of Michigan. Chermack was hired specifically to serve in a leadership role based on his experience and ability to manage clinical work in addition to supervising personnel.

Benn-Burton was section chief of the RCR and the LRC. In these roles she supervised several program directors, and at least one social worker and psychologist. Her duties as RCR required her to organize and supervise the functioning of several different programs including the Homeless Program and Compensated Work Program. She also ran a group therapy session and saw individual patients.

Benn-Burton, however, was not hired for a leadership position. She was hired in 1990 as a staff psychologist. She has accumulated more duties over the years, such as LRC, but her responsibilities were not nearly as extensive as Chermack's. His duties far exceeded Benn-Burton's in terms of scope and responsibility, number of staff managed, and diversity of programming. Benn-Burton has not demonstrated that she and Chermack perform substantially similar work.

In addition, VA explains that the appropriate comparison is Nicholas Giardino, section chief of the PTSD clinic at the Hosptial. Giardino is a GS-13, earns less than Benn-Burton, and held the duties of section chief for two years as a GS-13 before Benn-

Burton became section chief of RCR. Benn-Burton has not advanced sufficient evidence to show that she was paid less than a male for similar work.

## VI. Conclusion

Benn-Burton has not shown there is a genuine issue of fact regarding her claims which requires a trial for resolution. For the reasons stated above, defendant's motion for summary judgment is **GRANTED**. The case is **DISMISSED.**

**SO ORDERED.**

**Dated: November 3, 2011**

**s/Avern Cohn**
**AVERN COHN**
**UNITED STATES DISTRICT JUDGE**

**I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, Thursday, November 3, 2011, by electronic and/or ordinary mail.**

**s/Julie Owens**
**Case Manager, (313) 234-5160**